## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JOHN ANDREW FOSTER, individually, on behalf of himself and all others similarly situated, | |
| *Plaintiff*, | Case No._____ |
| v. | |
| SWEEPSTEAKES LIMITED d/b/a STAKE.US | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Andrew Foster ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant Sweepsteakes Limited d/b/a Stake.us ("Defendant" or "Stake"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

## NATURE OF THE CASE

1.     This case arises out of Stake's operation of an illegal online casino that it markets as a "free" "social casino," but in reality, is an unlicensed casino prohibited under Indiana law.

2.     Stake owns and operates one of the world's most popular and lucrative online casinos, known as Stake.com, available at https://stake.com.

3.     Although Stake.com has achieved global success, it is barred from operating in the United States due to stringent regulations on online gambling, which is entirely prohibited in several states, including Indiana. In an apparent attempt to circumvent these legal restrictions,

Stake launched Stake.us—a platform advertised to U.S. consumers as a "social casino" and sweepstakes gaming platform that allegedly does not involve real gambling. In truth, however, Stake.us is a virtual replica of Stake.com, merely rebranded to deceive both regulators and the public into believing it offers innocuous entertainment, when in fact it facilitates unlawful gambling activities.

4.     Through Stake.us, users have access to over approximately 1,200 industry games, including, *inter alia*, jackpots, slots, scratch cards, poker, baccarat, and roulette. Some of these games have the option to be played with a live dealer, further mimicking the experience of a physical casino.

5.     All of Stake's games are virtually identical to gambling or games of chance that exist in legally permitted, but highly regulated, brick-and-mortar physical gambling casinos within Indiana. The difference is that Stake's casino games are not legally permitted or regulated under Indiana law.

6.     On Stake.com, users purchase chips, place bets, and cash out their winnings—mirroring the experience of a traditional casino. Stake was well aware that directly selling gambling chips to U.S. consumers would immediately expose Stake.us as an illegal online casino.

7.     To obscure the true nature of its operations, Stake claims it only sells a virtual currency known as "Gold Coins," which it characterizes as nonredeemable tokens used solely for casual gameplay. According to Stake, these Gold Coins have no monetary value and cannot be exchanged for cash.

8.     However, every purchase of Gold Coins on Stake.us is bundled with a second token, called "Stake Cash," which is provided as a purportedly free bonus. Unlike Gold Coins, Stake Cash can be wagered on casino-style games and redeemed for cryptocurrency at a fixed exchange

rate of one U.S. Dollar per one Stake Cash—revealing its function as a vehicle for real-money gambling. The structure of these transactions makes clear that the true product being sold is Stake Cash, not Gold Coins. For example, a $20 purchase yields 20.1 Stake Cash and 200,000 Gold Coins; a $50 purchase yields 50.25 Stake Cash and 500,000 Gold coins; and so on. This pricing structure, combined with the platform's gameplay, demonstrates that Stake is selling access to real-money gambling while using Gold Coins as a façade to evade legal scrutiny and mislead consumers.

9.     By offering Stake Cash—which can be wagered on games of chance and redeemed for cryptocurrency—Stake.us functions as an unlicensed and unlawful online casino. Operating without regulatory oversight, Stake routinely violates Indiana gambling laws.

10.     Virtual gambling is both highly addictive and tightly regulated under Indiana law. Indiana prohibits unlicensed gambling that involves risking something of value, including virtual cash that can be redeemed for cash, prizes, or cryptocurrency. Stake.us's operations evade these legal requirements and intentionally targets Indiana citizens by providing unlicensed gambling services to Indiana residents via the internet.

11.     Stake's conduct disproportionately harms vulnerable populations, particularly those susceptible to gambling addiction and younger consumers lured by its "free play" marketing strategy. Stake saturates social media with eye-catching advertisements, influencer endorsements, and promotional content designed to make its games appear fun, safe, and harmless.

12.     Stake's intentional disregard for the laws of the State of Indiana has resulted in at least tens of millions of dollars in illegal gambling winnings going to Stake. Stake's operation in Indiana is an egregious violation of Indiana law. Stake must be enjoined from operating inside Indiana, and it must disgorge every cent it has earned from Indiana consumer's gambling losses.

13.     Plaintiff, individually and on behalf of all other similarly situated, seeks damages, restitution, and declaratory and injunctive relief to stop Stake's unlawful conduct.

## PARTIES

14.     At all times material hereto, Plaintiff has been a resident and citizen of Indiana, and is domiciled in Vigo County, Indiana.

15.     Plaintiff wagered and lost thousands of dollars on Stake's illegal gaming website. As a result, he suffered an injury in fact resulting in the loss of money and/or property that is recoverable in Indiana.

16.     Plaintiff did not know Stake.us was illegal gambling in Indiana.

17.     Stake is a for-profit Cyprus Limited Company, the primary purpose of which is to operate the website Stake.us. Its principal place of business is located at 28 Oktovriou, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

18.     Defendant operates an office in the United States located at 13101 Preston Rd, Ste 110-5027, Dallas, Texas, 75240.

19.     Stake owns and operates a gambling website (available at https://www.stake.us/) and app under the brand "Stake.us."  Stake conducts substantial business within the venue of this District.

20.     Stake actively operates and its internet gambling website within the state of Indiana and Vigo County, which websites and operations are unpermitted and illegal under Indiana law

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the

proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

22.    This Court has personal jurisdiction over Stake and venue is proper in this judicial District because Stake purposefully directed Stake.us to residents of Indiana (including by advertising and running promotional materials directed to persons in Indiana), knowingly accepted registrations, purchases of "coins" and "cash," and wagers placed with purchased "cash" on Stake.us from Plaintiff and numerous other persons in Indiana, and collected enormous revenues from the losses suffered by Plaintiff and numerous other persons in Indiana who placed wagers with such "cash" on Stake.us, such that a substantial portion of the events that gave rise to Plaintiff's claims occurred in Indiana and within this judicial District.

23.    This court has personal jurisdiction over Stake pursuant to Ind. R. Trial P. 4.4(A)(1) because Stake continually conducts business within the boundaries of the State of Indiana, attempts to contract to supply goods and services into Indiana, and has tortiously injured Indiana citizens by wrongly taking millions of dollars from Indiana citizens through illegal gambling operations that that take place in Indiana.

24.    Between in August 2023, Plaintiff registered and entered Stake.us, an internet casino website operated by Stake.

25.    Within this period, including within the past year, Plaintiff lost thousands of dollars playing the casino games of chance that are promoted and operated by Stake.

26.    Plaintiff is authorized to bring this action because Plaintiff was damaged by the illegal gambling operations conducted by Stake.

27.    Plaintiff is also authorized to bring this action on behalf of other similarly situated Indiana citizens who have gambled on Stake.us.

28.     Stake actively promotes and operates its internet gambling website that targets citizens of the State of Indiana or Indiana citizens and the actions of Stake constitutes conducting business within the state of Indiana and Vigo County.

29.     It was foreseeable and intended that Indiana consumers would use the Stake.us website because Stake knew that Indiana consumers frequently gamble on the website and that they would continue to do so.

30.     Stake knows that Indiana consumers use the website because it asks users to disclose which state they live in when registering to use the website.

31.     In fact, Stake encouraged it by not listing Indiana as an excluded territory on Stake.us, even while knowing that online gambling is illegal in Indiana.

32.     Stake actively disseminates targeted advertisements within the State of Indiana with the intent of promoting and selling its products and services to consumers here. As such, Stake does business with sufficient minimum contacts in Indiana.

33.     Stake has purposefully directed its activities toward this District.

34.     Stake has purposefully availed itself of the privileges of conducting activities in this District.

35.     Stake reached into Indiana and invited its consumers to participate on its website.

36.     Plaintiff's claim arises out and relates to Stake's forum-related activities.

37.     The exercise of jurisdiction over Stake is reasonable.

38.     Upon information and belief, Stake localizes its game for each market where it is distributed, including the United States.

39.     Upon information and belief, Stake has sold millions of dollars of virtual items to thousands of Indiana residents, most of which are repeat purchases by the same customers, by

contracting with the customers to sell virtual coins, virtual cash, and other goods in exchange for legal tender.

40.     Stake.us facilitates ongoing economic activity between thousands of Indiana players and Stake.

41.     Upon information and belief, Stake directly controls whether consumers in Indiana can complete purchases from Stake.us.

42.     Upon information and belief, Stake has the capability to determine where its customers are from, including whether purchases are being made from Indiana.

43.     Upon information and belief, Stake has the capability to prevent Indiana residents from completing purchases or placing wagers at Stake.us but has chosen to accept those purchases and wagers from Indiana residents. For example, Stake has exited entire state markets under pressure from state regulators.[1]

44.     Upon information and belief, Stake has taken no steps to restrict Indiana residents' access to Stake.us or to restrict the ability of Indiana residents to make purchases from Stake.us.

45.     Upon information and belief, Stake distributes its Stake.us app, in part, via the Apple app store and Google play store.

46.     Upon information and belief, in order to distribute Stake.us via the Apple app store and Google play store, Stake entered into a developer agreement with Apple and Google.

47.     Upon information and belief, in addition to Apple and Google, Stake has entered into development agreements with Amazon for the distribution of the Stake.us app, which has an $11 billion AI data center in Indiana.[2] Upon information and belief, under each of those

---

[1] Michigan Gaming Control Board sends cease-and-desist letters to US, international internet gaming companies due to illegal operations

[2] Amazon opens $11 billion AI data center Project Rainier in Indiana

agreements, Stake has accepted responsibility for the compliance of Stake.us with federal and state laws, including those of Indiana.

48.     Stake aggressively advertises Stake.us in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

49.     Upon information and belief, these advertisements for Stake.us were designed and directed to attract consumers in the United States, including those in this District, to play Stake.us.

50.     Upon information and belief, Stake has the capability of targeting its Stake.us advertisements by geography and the capability of excluding residents of Indiana from the reach of Stake's advertisements for Stake.us.

51.     Upon information and belief, Stake partners with Meta Platforms, Inc., to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Stake identifies as potentially interested in Stake.us, including residents of Indiana.[3] Upon information and belief, Stake utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Stake to identify the geographic location of its ad targets, including whether they are in Indiana.

52.     Upon information and belief, Stake has taken no steps to restrict its advertisements for Stake.us from reaching residents of Indiana.

---

[3]  *See* Harvard Magazine, *Governing Games of Chance* (Feb. 14, 2025), https://www.harvardmagazine.com/2025/03/harvard-research-gambling-publichealth-crisis. ("Online gambling companies precisely target consumers using predictive algorithms, personalization, and persuasive technologies, and train sophisticated algorithms to enhance an individual's user experience…Data on consumers are shared widely across the gambling ecosystem and are used to profile customer behaviors.") (cleaned up).

53.     Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in Stake.us occurred in this District.

54.     In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1) and § 1391(b)(3), in that Stake is subject to this Court's personal jurisdiction.

55.     Plaintiff alleges, upon information and belief, that Stake conducts professional and commercial activities in Indiana on a substantial, continuous, and systematic basis and therefore Stake is subject to the general jurisdiction of the courts of this state.

56.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to Stake's professional and commercial activities within Indiana, and therefore Stake is subject to the specific jurisdiction of the courts of this state.

57.     Stake operates an application and platform and has transacted business in the State of Indiana within the applicable statute of limitations. As in other states, Stake uses data collected from users in Indiana, including location-based data, to determine what content to recommend to those users and what advertisements to serve them. Stake has availed themselves of the benefit of transacting business in Indiana through the marketing, sale, and operation of well-known online gambling apps. This Court has personal jurisdiction over Stake under Ind. R. Trial P. 4.4(A).

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### I.    *The Problem of Online Gambling*

58.     Gambling is one of the oldest and most heavily regulated human behaviors. Even before the proliferation of science, religions across the world have recognized the inherent addictive nature of playing games of chance and banned them through biblical injunctions. As religious authority gave way to democratic governments, the vast majority of states in this country

enacted legislation prohibiting or strictly regulating gambling activities. Unlike historical relics, these states have recognized that gambling poses a public health risk. Scientific research has confirmed and shed further light on the perils of gambling--ranging from mental health issues to physical, financial, and interpersonal problems.[4]

59.    With technological advances, many casinos and other gambling operators proliferated into people's pockets through online websites and apps, including Stake.us. These online gambling platforms have been particularly challenging to regulate because many states' anti-gambling statutes were originally enacted to prohibit in-person gambling activities.

60.    Worse still, because these online gambling platforms operate outside of the confines of gambling laws, they knowingly rig the odds against users to further exploit them. For example, while slot machines in a physical casino are required to randomize their results, online gambling platforms tailor "wins" and "losses" to manipulate consumer engagement through powerful algorithms. As the CEO of a popular online gambling platform explained:

> The secret sauce of Playtika is our ability to work with AI. We know exactly when a player is going to stop playing. We know exactly when they're going to pay. We know how many times they come in each day. I can't say we can predict with 100 percent accuracy, but we can predict, for most of our players, their activities in our games. That's the real power behind the operations side. When you can predict this, you can find solutions to problems. If someone wants to move on from your game, to delete your app, you know how to handle that player. We sound the alarm. We know how to operate and make sure a player retains in the game.[5]

61.    Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms,

---

[4]    Harvard Magazine, *Governing Games of Chance* (Feb. 14, 2025), https://www.harvardmagazine.com/2025/03/harvard-research-gambling-publichealth-crisis.

[5] Dean Takahashi, *Playtika CEO Robert Antokol interview— Why player retention matters now, VENTUREBEAT* (Jan. 6, 2022), https://venturebeat.com/games/playtika-ceo-robert-antokol-interview-why-playerretention-mattersnow/.

including so called "social casinos."[6]

62.    Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[7] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[8]

63.    Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[9] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[10]

64.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[11]

65.    Further, internet searches for help with gambling addiction, such as "am I addicted

---

[6] "The Supreme Court has recognized that gambling involves the public welfare and that states have a substantial government interest in the health, safety and welfare of their citizens in relation to gambling activities." *F.A.C.E. Trading, Inc. v. Carter*, 821 N.E.2d 38, 41 (Ind. Ct. App. 2005) (citing *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 341 (1986)), *trans. denied.*

[7] https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_ (last accessed July 29, 2025).

[8] *See id.*

[9] https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed July 29, 2025).

[10] https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed July 29, 2025).

[11] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed July 29, 2025).

to gambling," have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[12]

66.    The surge in gambling addiction is particularly pronounced among young men,[13] with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[14] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

67.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers.[15] Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

68.    Treating online gambling addition poses challenges that are different from other

---

[12] https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm   (last accessed July 29, 2025).

[13] Courts have long carried a responsibility to protect children from temptation of gambling. *See People v. Gravenhorst,* 32 N.Y.S.2d 760, 777 (N.Y. Sp. Sess. 1942) ("Gambling is a pernicious practice, the offspring of idleness, and the prolific parent of vice and immorality, detrimental to the best interests of society, and encouraging wastefulness, thriftlessness and a belief that a livelihood may be earned by means other than honest industry. The use of these machines is a racket and constitutes a fraud on the innocent public who are unaware of the insidious evil of the display. *They contribute directly to delinquency among children* and instill and develop a desire to gamble among those who frequent them.") (emphasis added).

[14] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed July 29, 2025).

[15] The pressure to pass amenable laws for sweepstakes and gambling companies is immense. *See United States v. Arroyo,* 75 F.4th 705, 706 (7th Cir. 2023) ("Former State Representative Luis Arroyo accepted thousands of dollars in bribes to promote sweepstakes-gaming interests in the Illinois legislature and executive branch. When the government uncovered the bribery scheme, Arroyo was indicted and pleaded guilty to wire fraud. The district court sentenced him to 57 months' imprisonment and ordered that he forfeit $32,500 in bribe money.")

forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco, and drug addiction programs, there are no federal funds allocated to support problem gambling services.

69.     To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like Stake.us are unlicensed and unregulated. A gaming license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Stake dodges all of these requirements.

70.     For example, Stake accepts credit cards to pay for gambling, in violation of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367. This has caused many people to rack up massive debt gambling on Stake.us.

71.     Gambling has been good to Stake and its founders. Stake's websites now handle over 4% of all Bitcoin transactions in the world, a figure that is staggering when considering the total size of the cryptocurrency economy. Stake processes over $219 billion in Bitcoin transactions annually, an amount that far exceeds the financial turnover of many legitimate financial

institutions.

II.    *Indiana law prohibits Sweepstakes Casinos and Online Gambling.*

72.    Historically, Indiana has prohibited gambling. *See Caesars Riverboat Casino, LLC v. Kephart,* 934 N.E.2d 1120, 1121–22 (Ind. 2010) ("The restrictions date back to at least 1851 when the State adopted a Constitution that contained a prohibition against lotteries thereby making various forms of gambling unlawful. Ind. Const. Art. 15 § 8 (1851).")

73.    Anti-gaming statutes were passed to "remove as far as possible the temptation for gambling and prevent the evils arising therefrom." *Hatton v. Casey*, 93 Ind.App. 336, 178 N.E. 303, 305 (1931).

74.    While Indiana has legalized certain specific types of gambling in specific areas, the reasoning has been to maintain regulation and control. "This court has stated that the purpose of Indiana's statutory scheme authorizing a state operated lottery is to allow Indiana to regulate and maintain control over all lotteries conducted in this state." *Am. Legion Post No. 113 v. State*, 656 N.E.2d 1190, 1193 (Ind. Ct. App. 1995). Online, unregulated gambling is not one of the specific types of gambling Indiana has legalized.

75.    "[T]he State is able to protect its citizens from unlawful gambling through its close regulation. The State's interests far outweigh the entertainment and profit interests asserted by [the defendant]. Strict regulation of gambling through Indiana's anti-gambling statutes constitutes a valid exercise of the State's police power." *Id.* at 1194.

76.    In Indiana, gambling is defined as "risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device." I.C. § 35-45-5-1.

77.    Indiana law prohibits professional gambling, defined in part as "a person who knowingly or intentionally: (6) accepts or offers to accept, for profit, money or other property risked in gambling." I.C. § 35-45-5-3.

78.    "Profit" is defined under the statute as a "realized or unrealized benefit (other than

a gain) and includes benefits from proprietorship or management and unequal advantage in a series of transactions." I.C. § 35-45-5-1.

79.    Both physical casinos in Indiana and virtual casinos that are made available to Indiana consumers online are subject to these laws. *See,* I.C. § 35-45-5-1 (Both "(1) a card game; or (2) an electronic version of a card game" are "a game of chance and may not be considered a bona fide contest of skill.")

80.    A "gambling device" is defined to include either "(1) a mechanism by the operation of which a right to money or other property may be credited, in return for consideration, as the result of the operation of an element of chance; or (2) a mechanism that, when operated for a consideration, does not return the same value or property for the same consideration upon each operation." I.C. § 35-45-5-1.

81.    Indiana gambling law precludes "an operator who knowingly or intentionally uses the internet to: …(3) maintain on an internet site accessible to residents of Indiana, the equivalent of: (A) slot machines; (B) one-ball machines or variants of one-ball machines; (C) pinball machines that award anything other than an immediate and unrecorded right of replay; (D) roulette wheels; (E) dice tables; or (F) money or merchandise pushcards, punchboards, jars, or spindles…commits professional gambling over the Internet, a Level 6 felony." I.C. § 35-45-5-3.

82.    Indiana gambling law specifies that "[a] person outside Indiana who transmits information on a computer network (as defined in IC 35-43-2-3) and who knows or should know that the information is broadcast in Indiana submits to the jurisdiction of Indiana courts for prosecution under this section." Ind. Code Ann. § 35-45-5-4.5

83.    Stake blatantly disregards Indiana's clear prohibition on gambling. As discussed further below, the Stake.us platform allows users to purchase and wager "Stake Cash"—digital

currency that, like chips in a brick-and-mortar- casino, can be redeemed for cryptocurrency at a ratio of 1-to-1 with the US Dollar—on games of chances, including slot machines, jackpot games, and other casino-style offerings.[16] Cryptocurrency can easily be exchanged for US currency.

84.    Indeed, a user that wagers Stake Cash on the spin of a virtual slot machine is "risking money or other property for gain"— Stake Cash— "contingent in whole or in part"—the results of the slot machine spin—"upon lot, chance, or the operation of a gambling device" — namely, more Stake Cash, which can be redeemed for cryptocurrency.

85.    Critically, virtual cash, such as Stake Cash plainly constitutes "something of value" because it can be redeemed for cryptocurrency, which is considered "money" by most federal courts[17] and can be seamlessly converted to US currency, and because it is a credit that extends a player's privilege to play Stake's games. This is true regardless of whether any particular coin or cash was purchased directly or obtained as part of a bundle or promotion. Thus, Stake.us virtual casino games fall squarely within the ambit of Indiana's anti-gambling laws.

86.    The Indiana Attorney General's Office recently confirmed that "no 'licensed Indiana casino compan[y]' is permitted to facilitate online gambling for anything other than sports."[18]

## III.    *Indiana Law voids all instruments entered into.*

---

[16] Per Stake's own Terms and Conditions, Stake Cash "is redeemable at an implied rate of 1 Stake Cash per 1 USD. As such, the amount of cryptocurrency that can be redeemed per 1 Stake Cash will be determined by the market price of that cryptocurrency in USD at the time of such redemption (as determined in our discretion)."

[17] *See United States v. Harmon*, 474 F. Supp. 3d 76, 90 (D.D.C. 2020) (citing multiple federal district court decisions holding that Bitcoin qualifies as "money," generally based on the principle that cryptocurrencies are used to purchase things).

[18]  https://events.in.gov/event/illegal-gambling-website-rolls-the-dice-trying-to-mislead-hoosiers-into-thinking-its-affiliated-with-indianas-licensed-casinos.

87.    The only consideration paid by Plaintiff and the Class members relate to gambling.

88.    In Indiana, "[a] note, bill, bond, conveyance, contract, mortgage, or other security made in consideration of: (1) money or other property won as the result of a wager; or (2) the repayment of money lent at the time of a wager for the purpose of being wagered; is void." I. C. § 34-16-1-1.

89.    Thus, no contract was ever formed between the parties, and any purported contract between Plaintiff and Stake, and any contractually based defenses Stake may raise are likewise void.

90.    And the *entire* contract is void, because even if the arbitration provision is severed from the rest of any contract, the arbitration itself is void as a matter of law pursuant to § 34-16-1-1.

91.    Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

92.    Plaintiff and Class members had no opportunity to negotiate the contract terms, and the terms never changed for any Class member.

93.    Plaintiff and Class members had *zero* bargaining power.

94.    Plaintiff and Class members could not have used Stake.us unless they agreed to the terms and conditions, and they could not have obtained comparable products or services unless they agreed to arbitrate.

95.    The terms and conditions are not easily accessible, and the arbitration clause is not conspicuous. Instead, it is buried in a sea of font, in the same color and same type, not bold or in capital letters, and doesn't require an independent signature or acknowledgment.

96.    The terms and conditions also unconscionably limit Plaintiff's and Class members' damages, and do not afford them an opportunity to select or have a say in the arbitrator(s).

97.    Moreover, the scope of the arbitration agreement is too large, covering every single

claim against every single party, known or unknown.

98.     The inclusion of a class action waiver is also unconscionable as the only practical effect is to chill or prevent claims, affording Stake immunity.

99.     Moreover, the expenses and forum are unfair and unconscionable, as the cost to pursue individual arbitration likely exceeds the reward, further chilling and preventing claims and affording Stake immunity.

100.    In sum, Plaintiff and Class members paid to forgo everything—inability to protect their statutory and constitutional rights—and Stake gains immunity at no cost. Plaintiff and Class members were not given a *quid pro quo* for agreeing to arbitrate and forgoing their constitutional right to a trial by jury.

101.    Moreover, Plaintiff and Class members were fraudulently induced into entering these contracts. Stake misrepresented that Stake.us was legal in Indiana, on which Plaintiff and Class members relied. Had Stake disclosed the truth that Stake.us is not legal in Indiana, Plaintiff and Class members would not have entered into the contract with Stake.

102.    Finally, the terms and conditions are illusory, as Stake reserves the right to change the terms at any time without prior notice and the changes are immediately binding.

**IV.    *Stake Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.***

103.    Stake.us advertises itself as a "social casino" that is "free to play" to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. This false representation misleads consumers, including Plaintiff, into believing that they are participating in harmless gameplay rather than actual-money gambling, even when wagering with Stake Cash. In doing so, Stake enables users to engage in real-money gambling through its system of Stake Cash, deceiving consumers into believing they are

participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

104.    The app offers a multitude of digital slot machines and other forms of lottery wheel. Through Stake.us, Stake offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Stake Cash.

105.    Players can access Stake.us either through internet websites or on Apple and Android devices in the United States through the App Store and Play Store, respectively.

106.    When Indiana consumers visit Stake's websites for the first time, the Indiana consumers are awarded a nominal allocation of "free cash." Indiana consumers also receive coins as a free daily bonus once a day when logging into their accounts.

107.    When players log onto the website, they are met with rows of games to choose from, including slots and jackpot games.

108.    Before playing a game of chance on Stake's sites, players must select their play mode (either Gold Coins or Stake Cash) by moving the toggle button. Indiana consumers may switch between these two modes easily and as frequently as they would like.

109.    It is important to note that it is only possible to play Stake's games through the wagering of either Gold Coins or Stake Cash. It is impossible for an Indiana consumer to play Stake's games when the Indiana consumer does not have a balance of coins or cash in an account with Stake. Every one of Stake's games require a wager to participate.

110.    Once a mode is selected, games allow players to wager the corresponding type of coin or cash. Depending on the outcome of the spin, a player may earn more coins or cash. Stake makes it easy to switch between wagering the Coins or Cash. This simple mechanism is designed to make it as convenient as possible for players to transition gambling with real-world stakes.

Players who start out having fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

111.    In Indiana, it is illegal to operate and offer online gambling casinos, including, like here, websites that offer slot machines, jackpots, and poker. I.C. § 35-45-5-2. In this regard, Indiana has a fundamental and deep-rooted public policy against gambling.

112.    Despite Indiana's clear prohibition on online gambling, Stake operates unlicensed and illegal online casinos within Indiana, as discussed further below.

113.    Players of Stake.us stake or risk "something of value" when playing any of the games of chance offered on Stake's website. Specifically, players use Stake Cash to play various casino-style games, many of which are determined predominantly by chance rather than skill. When Stake Cash is used, players risk this cash for the opportunity to win additional Stake Cash, which can be redeemed for cryptocurrency at a ratio of 1-to-1 with the US Dollar. If a player wins, they retain and often multiply the cash they staked; if they lose, that cash is forfeited. This distinguishes Stake.us from traditional video games, where a user expends in-game currency or tokens to play regardless of the outcome. In Stake.us players either maintain and grow their balance, or lose it, based on the results of chance-based games, closely resembling the mechanics of real-money gambling.

114.    Under Indiana law, gambling means "risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device." I.C. § 35-45-5-1.

115.    While Stake.us's games require some level of user interaction, chance is the predominant factor in determining outcomes. Specifically, in slot machines and other casino-style games featured on the site, the results are driven by random number generators or other chance-

based mechanics. Upon information and belief, these outcomes are not influenced by player skill or strategy, but instead by algorithms designed to introduce randomness. As a result, the element of chance materially impacts the result of each game and thus, Stake's games fall squarely within Indiana's statutory prohibitions.

116.    The slight degree of user interaction does not remove Stake.us's games from the definition of games of "chance" or "contest of chance" under Indiana law. Numerous games widely recognized as gambling, such as blackjack and craps, involve user interaction. User interaction is also a known feature in real-world slot machines. Stake.us's games are akin to real world casino games known as "I-Slots" or interactive slots, which are recognized forms of gambling that allows players to influence the outcome through choices and gameplay.[19]

117.    Even players with extensive experience or knowledge of casino-style games may lose repeatedly if the game's underlying randomization is not in their favor. Conversely, less experienced users may win when the randomized outcomes align advantageously. This inherent unpredictability reinforces that chance, rather than skill, is the dominant factor in the outcome of Stake.us's games.

118.    The Gold Coins and Stake Cash in Stake.us are "money or other property" under Indiana law.

119.    Stake's game design deliberately replicates the hallmarks of licensed, chance-

---

[19] BetMGM, *Slots and the World of Narrative Gaming*,https://casino.betmgm.com/en/blog/islots-narrative-gaming/ (last accessed January 25, 2025); SDLC Corp., *How Slot Games Are Incorporating Interactive Features and Mini-Games*; https://sdlccorp.com/post/how-slot-games-are-incorporating-interactive-features-and-mini-games/ (last visited Dec. 31, 2024); https://lcb.org/articles/i-slots (last accessed January 25, 2025); Casino Life, *The Different Types of Online Slots & Their Features*; https://www.casinolifemagazine.com/blog/different-types-online-slots-theirfeatures#:~:text=I%2DSlots%2C%20or%20interactive%20slots,outcome%20through%20choices%20and%20gameplay (last accessed January 25, 2025).

based casino games to create an authentic gambling experience. From spinning reels and celebratory animations to jackpot symbols and dynamic sound effects, all of the games provided on Stake's platforms evoke the same psychological triggers that drive gambling behaviors in brick-and-mortar casinos.

120.    In sum, Stake's Stake.us casino platforms host casino-style games that are unmistakably games of chance. By offering these games of chance, Stake is operating unregulated online casinos in violation of Indiana law, which explicitly prohibits unlawful gambling conducted over the internet. I.C. § 35-45-5-2.

## V.    *The Dual Currency System*

121.    Stake attempts to circumvent this prohibition of online gambling by branding their casino games as free to play, so-called "sweepstakes" games.[20] The core of Stake's "sweepstakes" casino model is a dual currency system deliberately designed to obscure the fact users are engaging in real-money gambling.

122.    Players on all of its illegal gambling websites are introduced to two types of virtual currency: Gold Coins which purportedly hold no monetary value and are marketed as being solely for entertainment purposes, and Stake Cash, which can be redeemed for cryptocurrency at a ratio of 1-to-1 with the U.S. Dollar and serves as the gateway to Stake's illegal gambling operations.

---

[20] Such creative (and obvious) circumvention is as old as this nation's gambling laws. *See In re Cullinan,* 114 A.D. 654, 657, 99 N.Y.S. 1097, 1099 (App. Div. 1906) ("Like most endeavors to adhere to the letter of the law while violating its spirit, he cannot succeed. The present device attractively ministers to the gambling humor the same as other slot machines of substantially similar design."); *State v. Lipkin,* 169 N.C. 265, 84 S.E. 340, 343 (1915) ("[N]o sooner is a lottery defined, and the definition applied to a given state of facts, than ingenuity is at work to evolve some scheme of evasion which is within the mischief, but not quite within the letter, of the definition."); *People ex rel. Lockyer v. Pac. Gaming Techs.,* 82 Cal. App. 4th 699, 700–01, 98 Cal. Rptr. 2d 400, 401 (2000) ("The VendaTel looks like a slot machine. It acts like a slot machine. It sounds like a slot machine.…In our view, if it looks like a duck, walks like a duck, and sounds like a duck, it is a duck. And so it is with this duck.").

123.    Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and then must purchase more Gold Coins to keep playing. Stake emphasizes that Gold Coins are non-redeemable in an effort to support its claim that its games are "free-to-play."

124.    However, when selling these Gold Coins, Stake also issues the Indiana consumer an allocation of "Stake Cash."

125.    Stake Cash is synonymous with and the equivalent of real currency. When using Stake Cash to wager on Stake's games of chance, it is the exact same as using chips to wager on games of chance in a brick-and-mortar casino. Wagering Stake Cash on games of chance is real money gambling and getting Indiana consumers to wager Stake Cash is the goal of Stake.

126.    While Stake insists that its illegal gambling games are free to play, this is incredibly misleading. It is true that players can obtain a limited amount of Stake Cash as bonuses for one-time "promotions," such as by initially signing up to use Stake's services, completing an onerous mail-in request to obtain Stake Cash, or linking the player's Facebook account. But the only way a player would even know about these "free" methods of obtaining Stake Cash is if they found Stake's Terms and Condition Rules—which are not conspicuously linked anywhere in the casino games—and combed through the fine print. In fact, the only advertised way of obtaining Stake Cash is to purchase or collect bundled packages of Gold Coins and Stake Cash.

127.    When a player runs out of Gold Coins, they are prompted to purchase more in a bundled package with Stake Cash.  Stake characterizes these transactions as primarily Gold Coin purchases with Stake Cash supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Stake Cash.

128.    Upon information and belief, players can make purchases using debit cards, credit

cards, bank transfers, gift cards, and digital wallet transactions.

129.    Stake makes money by taking the other side of the Indiana consumer's wagers (betting against the Indiana consumer) in all their games, except for the poker games where Stake makes money by taking a "rake" (a percentage of every pot or wagers made in a hand of poker) or by charging a fee for organizing poker tournaments.

130.    Stake's dual currency structure transforms what appears to be innocuous gaming platforms into unregulated online casinos where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.[21]

## VI.    *Stake Resurrects Internet Sweepstakes Café Model from Early 2000s*

131.    Stake will ask the Court to disbelieve its own eyes and conclude that Stake.us is not really a gambling operation, but instead offers legal "sweepstakes." That is an old gimmick that was once popular among criminals in the early 2000's. As detailed below, courts and law

---

[21] *See United States v. Davis,* 690 F.3d 330, 339 (5th Cir. 2012) ("there is legally sufficient evidence from which a reasonable fact-finder could infer that the sale of Internet time at the defendants' cafés was an attempt to legitimize an illegal lottery. Customers' receipts indicating over 300,000 minutes of Internet time remaining were evidence that the customers did not value the Internet time they had purchased."); *Lucky Bob's Internet Cafe, LLC v. California Dep't of Just.,* No. 11-CV-148 BEN JMA, 2013 WL 1849270, at *1 (S.D. Cal. May 1, 2013) ("Players at both Lucky Bob's and Deja Vu did not use the vast majority of internet time they purchased. At Lucky Bob's, a total of $1,225,055 was spent for 204,176 hours of internet time and 97.375% of the total purchased internet time was unused. At Deja Vu, a total of $12,916,254 was spend for 2,152,709 hours of internet time and 99.735% of the total purchased internet time was unused.") (cleaned up); *People ex rel. Green v. Grewal,* 61 Cal. 4th 544, 565, 352 P.3d 275, 287 (2015) ("The evidence shows that customers who ostensibly bought telephone cards never used some two-thirds of the purchased telephone time… the customers were nonetheless clearly paying, at least in part, and, it appears, in large part, for the opportunity to play the casino-style sweepstakes games and win cash prizes.").

enforcement agencies consistently determined that the same business model Stake utilizes today is a pretext for illegal gambling. A federal district court has already held on summary judgment that one of Stake's competitors that operates materially the same way is an illegal gambling operation, and a jury later awarded close to $25 million in damages to a class of Washington state residents. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024).

132.    In the early 2000s, a widespread trend emerged in which criminals attempted to circumvent state gambling laws by establishing so-called "Internet sweepstakes cafés." Indiana was no exception to this.

133.    These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to wager and gamble on casino style games of chance on computer terminals, with the chance to win real cash prizes.

134.    Most state gambling statutes define gambling as involving three core elements: (1) consideration**,** (2) chance, and (3) a prize**.** Operators of these internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

135.    Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations and moved to shut them down under applicable state gambling laws.

136.    In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer

terminals. The defendant promoted the sale of internet time and other products with a "sweepstakes" giveaway, wherein the defendant provided 100 "sweepstakes points" for each dollar spent, which could then be used to play games of chance. The defendant denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were "not gambling" but instead a "promotional game." The Kern County District Attorney obtained a civil injunction for violations of California's gambling laws, and that injunction was affirmed on appeal.

137.    In *Telesweeps of Butler Valley, Inc. v. Kelly*, 2012 WL 4839010 (M.D. Pa. Oct. 10, 2012), a Pennsylvania federal court held that the purchase of a long-distance telephone card that came with a commensurate number of free entries to participate in a 'casino-style' sweepstakes game constituted "indirect consideration" to participate in the sweepstakes, even though no purchase was necessary and (like here) alternative methods of free entry were available. In rejecting the defendant's argument that the customer was simply paying for telephone time and not the sweepstakes entries, the court declared that "plaintiff's attempt to separate the consideration from the chance to win by inserting a step between the two elements is clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling." *Telesweeps*, at *9.

138.    The Ohio Court of Appeals said it best when rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731 (2013): "the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and a scheme of chance." *Thorne*, 987 N.E.2d at 744.

139.    Stake is copying the internet café playbook. Instead of selling internet time, long-distance phone minutes, or small groceries coupled with supposedly "free" sweepstake tokens,

Stake sells Gold Coins, which are then ignored so that players can use the Stake Cash for cryptocurrency gambling. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

140.    Stake's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public.

## VII.    *Stake's Gambling Without Statutory Consumer Protections*

141.    The harm inflicted through this dual currency system is further exacerbated by Stake's lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Stake operates without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

142.    Unlike legally permitted casinos, Stake uses unpermitted techniques to force Indiana consumers to play Stake's games and eventually lose their Stake Cash balance. These techniques include establishing restrictions on how and when Stake Cash can be redeemed and turned into cryptocurrency. This holding of Stake Cash is Stake's way to force Indiana consumers to continue gambling and more than likely, lose Stake Cash. Stake also only permits one redemption of Stake Cash per use of the website. Further, Stake has implemented weeks long delays to "approve" and "process" redemptions of Stake Cash. These restrictions are designed to further entice Indiana consumers to cancel their redemption requests and continue playing the casino games. These restrictions are oppressive and are illegal at brick-and-mortar casinos where gambling is permitted and highly regulated.

143.     Winning any actual money through accumulating Stake Cash is often a pipe dream, however, because these games of chance are not subject to regulation in the United States (Stake claims to be regulated in the Island of Cyprus), and the games certainly heavily favor Stake.

144.     Furthermore, Stake imposes a "3x playthrough" requirement on bonus Stake Cash, mandating that players must wager an amount three times the number of bonus Stake Cash they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Stake Cash, a player must first wager at least 75 Stake Cash on one of their casino-style games. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Stake's operations.

145.     Stake's online casino actively undermines critical consumer protections required by Indiana law. For example, Stake allows anybody over the age of 18 to gamble on its casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in Indiana. I.C. § 4-36-5-7; I.C. § 4-33-9-13.

146.     Stake also disregards the consumer protection, self-exclusion program regulations that brick-and-mortar Indiana casinos are required to abide by. I. C. § 4-33-4-3(b).

147.     Gambling is highly regulated for a reason and illegal gambling is strictly prohibited in the State of Indiana. However, Stake is attempting to skirt all regulations and operate illegally in the State of Indiana by claiming it is not operating within Indiana, and it is simply a social

casino. However, as evidenced by Stake's press releases when it "exits" a state that sends Stake a cease and desist letter, Stake has control over where its games are played, can and does exit a state's market when told (sometimes repeatedly) to do so, and therefore has purposely availed itself of business in Indiana.

148.    Stake attempts to escape civil litigation[22] to provide compensation to its victims and escape the jurisdiction of the Courts by utilizing illegal and "void" Terms of Service which are contrary to Indiana public policy under the rules established by *Bonny v. Soc'y of Lloyd's,* 3 F.3d 156, 160 (7th Cir.1993) and *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10 (1972).

149.    These attempts include arbitration clauses, forum selection clauses, and choice of law provisions which are likewise "void" and contrary to Indiana public policy because (1) under Indiana law they are contracts based on illegal gambling consideration, (2) the clauses are procedurally and substantively unconscionable, and (3) the important public policy interest in adjudicating this case in this Court in the State of Indiana.

150.    "[I]n certain circumstances a court may declare an otherwise valid contract unenforceable if it contravenes the public policy of Indiana." *Ransburg v. Richards,* 770 N.E.2d 393, 396 (Ind. Ct. App. 2002).

151.    In addition, Stake's Terms of Service, including each and every clause attempting to compel arbitration, and all attempts at creating class waivers, forum selection clauses and choice of law provisions are likewise "void" and contrary to Indiana public policy. Stake's Terms of Service are so one-sided that they are unconscionable and illusory. These types of clauses make

---

[22] *See United States v. Davis*, 690 F.3d 330, 339 (5th Cir. 2012) ("Finally, it is reasonable to infer that Davis's and Clark's purpose for the cafés was to legitimize illegal gambling from the fact that café customers were required to sign a form stating that they were not gambling upon entering at least one of the cafés; legitimate businesses ordinarily do not require such formalities.")

each and every part of the Stake Terms of Service void and unenforceable by Stake.

## VIII.    Stake Continues to Break the Law

152.    Stake has exited the markets of 12 states,[23] but continues to purposefully target Indiana consumers.

153.    Stake is currently being sued in at least ten states but has chosen to continue operating its unambiguously illegal gambling websites across the majority of the United States.

<u>**FACTS SPECIFIC TO PLAINTIFF**</u>

*Plaintiff's Experience*

154.    In response to Stake's online advertising and representations described above, and under the belief that he was playing harmless and "free" social gaming, Plaintiff played Stake.us from approximately August 2023 through the present, including within the past year, during which he made many in-game purchases of Stake Cash.

155.    Plaintiff accessed Stake.us from his residence in Indiana. Plaintiff received an initial allotment of Gold Coins and Stake Cash.

156.    After losing his initial allocation of free Gold Coins and Stake Cash, he began purchasing Stake Cash from Stake and did so from Indiana, which Stake accepted.

157.    Plaintiff placed all or substantially all of her wagers in Stake.us in Indiana.

158.    Overall, Plaintiff wagered and lost, at least, thousands of dollars in real-world currency while using Stake.us and its games of chance, including slots with the goal of winning real cash prizes. He lost the cash he purchased from Stake by wagering them in Stake.us's games of chance.

159.    By and through Stake.us's gambling features described above, Plaintiff was induced into making certain in-game purchases and wagers that he otherwise would not have made.

160.    As a result of Stake's unfair, unlawful, and deceptive acts, Stake was unjustly enriched.

---

[23] <u>Why Stake.us Is Leaving More States In 2025 - SCCG Management</u>

## CLASS ALLEGATIONS

161.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of himself and all others similarly situated defined as follows:

162.    The Class is defined as follows:

**Indiana Class**: All Indiana residents who, during the applicable limitations period, have lost money wagering on Stake's online casino games.

163.    Excluded from the Class is: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Stake, Stake's subsidiaries, parents, successors, predecessors, and any entity in which Stake or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Stake's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

164.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff currently but may be ascertained from Stake's business records and other third-party sources.

165.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

  a.  Whether the games in Stake.us are prohibited gambling as defined under Indiana law;

  b.  Whether Stake engaged in the conduct alleged in the Complaint;

c.   Whether Stake violates the applicable law listed below in Counts I, II, and III;

d.   Whether Stake violates statutes analogous to those alleged herein applicable;

e.   Whether and how Stake manipulates the odds in games offered in Stake.us;

f.   Whether Plaintiff and Class members wagered and lost money or other things value on Stake.us in the last 180 days in Indiana;

g.   The amount of money or other things of value wagered and lost by Plaintiff and Class members on Stake.us in the last 180 days in Indiana;

h.   Whether Stake engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Indiana;

i.   Whether Stake's unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Indiana were likely to deceive Class members;

j.   Whether Plaintiff and the other Class members were damaged by Stake's conduct; and

k.   Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

166.    **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of Stake.us who made in-game purchases of coins and wagered such coins as a result of Stake's unlawful and wrongful conduct. The factual and legal basis of Stake's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Stake's unlawful and wrongful conduct.

167.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

168.    **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Stake, so it would be impracticable for members of the proposed Class to individually seek redress for Stake's wrongful conduct.

169.    **Final Declaratory or Injunctive Relief.** Stake has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

### FIRST CAUSE OF ACTION
**Violation of the Indiana Loss Recovery Statute**
**I.C. § 34-16-1-2**
(***On Behalf of Plaintiff and the Indiana Class***)

170.    Plaintiff repeats, realleges, and incorporates the above allegations by reference as if fully set forth herein.

171.    Plaintiff brings this count individually and on behalf of the Indiana Class under Indiana Code § 34-16-1-2, which was enacted to effectuate the State's public policy against unlawful gambling.

172.    All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in Indiana. I.C. § 35-45-5-2.

173.    Section 34-16-1-2 of the Loss Recovery Statute provides: "If a person, by betting on a game or on the hands or sides of persons playing a game: (1) loses any money or other property; and (2) delivers any part of the money or other property; the person may bring a civil action, within one hundred eighty (180) days, to recover the money or other property so lost and

delivered." I.C. § 34-16-1-2

174.    Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

175.    Stake's casino games solicit gambling because they invite users to play games of chance (e.g., online slot machines) for money or other things of value (Stake Cash), which constitutes illegal gambling under Indiana penal law. *See* I.C. § 35-45-5-2 "An operator who knowingly or intentionally uses the Internet to engage in unlawful gambling: (1) in Indiana; or (2) with a person located in Indiana; commits a Level 6 felony"; I.C. § 35-45-5-1 (defining "gambling" as "risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device" and defining "gambling device," as "(1) a mechanism by the operation of which a right to money or other property may be credited, in return for consideration, as the result of the operation of an element of chance; (2) a mechanism that, when operated for a consideration, does not return the same value or property for the same consideration upon each operation; (3) a mechanism, furniture, fixture, construction, or installation designed primarily for use in connection with professional gambling." I. C. § 35-45-5-1.

176.    Stake's Stake Cash constitutes money or other property because its value is tied to the U.S. Dollar ratio. Just like casino chips in a brick-and-mortar casino, Stake Cash serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

177.    Stake's online casino platform is an Internet site and app that permits consumers to play games of chance (e.g., online slot machines) for money or other things of value (Stake Cash).

178.    Every casino game offered on Stake's online platform is a "gambling device"

because they accept money or other valuable items (Stake Cash) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Stake Cash) with the potential to win or lose money or other valuable items (Stake Cash).

179.    Stake's games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Stake has a direct stake in the result of the gambling. When players wager Stake Cash on games of chance and win, they can redeem their winnings for real prizes in cryptocurrency—meaning Stake incurs the equivalent monetary loss. Conversely, when players bet Stake Cash on games of chance and lose, Stake retains the full value of the lost Stake Cash, just as traditional casinos profit from losing bets placed against the house.

180.    By purchasing, wagering, and losing Stake Cash on Stake's casino platform, Plaintiff and each member of the Indiana Class gambled and lost money or things of value.

181.    Stake owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the Indiana Class members' gambling losses. Upon information and belief, the money wagered by Plaintiff and the Indiana Class on Stake's games was delivered or deposited into accounts owned or controlled by Stake. This satisfies the pleading requirements for the Loss Recovery Statute which states: "[i]n the civil action, it is sufficient for the plaintiff to allege that the defendant has received the money or other property so lost and delivered." I.C. § 34-16-1-3.

182.    Stake operates an illegal gambling website that is accessible in Indiana.

183.    Plaintiff's and the Indiana Class members' losses occurred in Indiana because Stake's online casino games were played by Indiana residents on computers, mobile phones, and

mobile devices in the State of Indiana. Stake had actual knowledge that Plaintiff and the Indiana

Class members reside in Indiana because each of them selected "Indiana" as their state of residence

and provided their complete home address pursuant to Stake's mandatory registration process.

184.    Plaintiff, on behalf of himself and the Indiana Class members, seeks an order

requiring Stake to (1) cease the operation of its gambling business, and (2) return all lost monies,

with costs.

**SECOND CAUSE OF ACTION**
**Violation of Indiana Code § 24-5-0.5-3 (Deceptive Acts and Practices)**
*(On behalf of Plaintiff and the Indiana Class)*

185.    Plaintiff repeats, realleges, and incorporates the allegations above by reference as

if fully set forth herein.

186.    Indiana law prohibits any "unfair, abusive, or deceptive act, omission, or practice

in connection with a consumer transaction" in the State of Indiana. I. C. § 24-5-0.5-3.

187.    Indiana Code § 24-5-0.5-3 applies to Stake's actions and conduct as described

herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or

practices in business transactions, including those involving the marketing and sale of goods or

services to Indiana consumers.

188.    Plaintiff and the members of the Indiana Class are "persons" within the meaning of

Indiana Code § 24-5-0.5-2.

189.    Stake engaged in consumer-oriented conduct by marketing Stake.us as a "free"

"social casino," while concealing the fact that its platforms constitute unlawful gambling with real

financial risks.

190.    Stake further misleads consumers by bundling Gold Coins with Stake Cash that has

redeemable value, thereby disguising the true nature of its unlawful gambling business model.

191.    Stake's practices described herein, including the operation of an illegal casino and the sale of Stake Cash, are deceptive under Indiana Code § 24-5-0.5-3 because they contravene Indiana's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who purchased Stake Cash.

192.    Stake caused substantial injury to Plaintiff and the Indiana Class by inducing them to purchase and wager Stake Cash through the design of its illegal gambling platform. The injury caused by Stake's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

193.    Stake's unfair practices occurred during the marketing and sale of Stake Cash for use on Stake.us's illegal gambling platform, and thus, occurred in the course of trade and commerce.

194.    Further, Stake represents to consumers, including Plaintiff, that its games are not gambling and you can "play for free." Stake deceptively brands itself as a "Social Casino," which it describes as "an online platform that offers casino - style games for entertainment purposes, without involving real money . . . The primary goal is entertainment rather than financial gain, making it a fun and social alternative to traditional online casinos."[24] This is to deceive consumers into believing that they are not engaging in gambling by wagering Stake Cash on the games of chance offered on its platform. Plaintiff relied on these representations in playing on Stake.us.

195.    Further, Stake conceals from consumers, including Plaintiff and the Indiana Class, that wagering with Stake Cash on its platforms constitutes illegal gambling prohibited by state law.

196.    Stake aggressively markets and advertises its platform through various media while

---

[24]    https://help.stake.us/en/articles/8570538-what-is-a-social-casino-and-sweepstakes    (accessed August 15, 2025).

at the same time concealing that it is illegal under state law. As such, Indiana consumers, including Plaintiff and the Indiana Class, are highly likely to continue to encounter current and future iterations of Stake's illegal platforms absent injunctive relief.

197.    Stake's conduct is deceptive because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

198.    These deceptive practices are material and likely to mislead reasonable consumers, who are led to believe they are participating in harmless social gaming rather than unlawful, unregulated gambling.

199.    As a direct and proximate result of Stake's violations of Indiana Code § 24-5-0.5-3, Plaintiff and the Indiana Class members have suffered actual injury  in the form of lost monies paid to purchase Stake's coin packages and monies lost wagering Stake's Stake Cash.

200.    Plaintiff, on behalf of himself and the Indiana Class members, seeks an order requiring Stake to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Stake Cash to Plaintiff and the Indiana Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
***(On behalf of Plaintiff and the Indiana Class)***

201.    Plaintiff repeats, realleges, and incorporates the above allegations by reference as if fully set forth herein.

202.    Plaintiff and the Indiana Class members have conferred a benefit upon Stake in the

form of the money they paid for the purchase of Stake Cash to wager on Stake's illegal casino platforms.

203.    Stake appreciates and has knowledge of the benefits conferred upon it by Plaintiff and the Indiana Class.

204.    Under principles of equity and good conscience, Stake should not be permitted to retain the money obtained from Plaintiff and the Indiana Class members, which Stake has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Stake has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

205.    Accordingly, Plaintiff and the Indiana Class members seek full disgorgement of all money Stake has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.    Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4.    Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5.    Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Stake from continuing to engage in the wrongful acts and practices alleged herein;

7. Declaratory and equitable relief, including restitution and disgorgement;

8. For public injunctive and declaratory relief as the Court may deem proper; and

9. Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: November 20, 2025,                         Respectfully submitted,

By: *Gary M. Klinger*
Gary M. Klinger
**MILBERG PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

James R. DeMay*
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
900 West Morgan St.
Raleigh, North Carolina 27603
Tel: 704-941-4648
JDeMay@brysonpllc.com

* *Pro hac vice to be submitted*

*Counsel for Plaintiff and the Proposed Class*